**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| HEIDI HAMILTON,<br>Plaintiff,<br>vs.<br>SEARS ROEBUCK AND COMPANY, a Foreign Corporation, d/b/a THE GREAT INDOORS,<br>Defendant. | ) | 2:06-cv-0235-RCJ-LRL<br>**ORDER** |

Before the Court are Defendant's Motion for Summary Judgment (#54), and Plaintiff's Motion for Partial Summary Judgment (#57). The Court has considered the City's Motion and the pleadings on file on behalf of all parties. IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is *granted in part* and *denied in part.* IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is *granted in part* and *denied in part.*

Plaintiff Heidi Hamilton was a Store General manager ("SGM") for The Great Indoors ("TGI") store in Las Vegas, NV. After little more than a year on the job, Hamilton resigned, receiving a one month severance package. Hamilton then filed this action alleging sex discrimination, disparate treatment, hostile work environment, retaliation, and a COBRA violation under ERISA.

**I. Background to the Litigation.**

During the time frame of this lawsuit, TGI operated seventeen stores that retail housewares. TGI also had in place fair employment policies that prohibit harassment and discrimination in the workplace. The policies strictly prohibit discrimination and harassment based on an employee's gender, as well as retaliation against employees for protected conduct. Hamilton was aware of TGI's fair employment policies, she also knew that the same policies applied to her as a store manager. (#56 Ex. A, Deposition of Heidi Hamilton p. 32; *see also* Brochure on Harassment and Discrimination in the workplace,
#56 Ex. B.)

TGI hired Hamilton in Chino, California, on November 9, 2003, as a Store Manager in Training. (#56 Ex. A, Hamilton pp. 65-66.) She was transferred to the Las Vegas TGI store as its SGM on December 9, 2003. (*Id.* pp. 14, 69.) Hamilton knew that she was an at-will employee who could be terminated at any time. (*Id.* p. 52.) All SGMs are placed in a 90-day probationary period. (#56 Ex. C, Deposition of Barry Davidson p. 62.)

Barry Davidson started in his role as the Western Regional Manager on the same day that Hamilton started her employment with TGI. (#56 Ex. C, Davidson p. 45.) Seven SGMs, including Hamilton, reported to Davidson. (*Id.* pp. 21-22.) Davidson reported to Mike Buxton ("Buxton"), the Vice President of Operations. (#56 Ex. D, Deposition of Michael Buxton p. 14, Ex. D.) Buxton reported to Catherine David ("David"), the Vice President and General Manager of TGI, who effectively was in charge of the TGI division of Sears. (#56 Ex. E, Deposition of Catherine David p. 13.) Neither Buxton or David had significant qualitative contacts with Hamilton; each could recall visiting Hamilton's TGI store only once during her employment. (#56 Ex. D, Buxton pp. 25-26; #56 Ex. E, C. David p. 25.)

During this time period, David Ruckrich was employed as a Regional Human Resources Manager at The Great Indoors. (#56 Ex. F, Deposition of David Ruckrich p. 12.) As HR Regional Manager, David Ruckrich fielded calls from store managers or personnel managers about associate issues, and he worked on HR strategy, policies, and procedures. (*Id.* pp. 24-30.) At most, Ruckrich saw Hamilton on a quarterly basis. (*Id.* p. 16.)

## II. **January 2004 Through May 2004: Hamilton's Performance During the Extended Probationary Period.**

Hamilton's first complaint concerning Davidson involves his alleged conduct at an annual meeting of SGMs in Hoffman Estates, Illinois, on January 4, 2004. (#56 Ex. A, Hamilton p. 23.) During a portion of the meeting, the Western Region SGMs met to discuss issues related to TGI. Hamilton alleges that Davidson did not "write down" her ideas until a male SGM agreed with her. (*Id.* pp. 24-25; 27.) She also claims that Davidson stated that he wanted one of the male SGMs to present the summary of the Western Region's meeting to the group at large. (*Id.* pp. 28; 30; 46.) Hamilton believes these actions are evidence of sex discrimination, but she did not report them at the time. (*Id.* pp. 27, 32.)

On January 28, 2004, Davidson, Ruckrich, and Hamilton met to discuss Davidson's concerns about Hamilton's performance. Performance issues cited in a memoranda summarizing the meeting include, that the standard morning meetings were not happening, Hamilton was not responding to e-mails, she did not run staff meetings, she was not approachable, and she did not know the store's numbers. (#56 Ex. A, Hamilton Ex. 19.)

Sometime before February 5, 2004, Hamilton stated that Davidson "shushed" her three times while they were working. (#56 Ex. A, Hamilton pp. 58-59.) Hamilton confronted Davidson about the shushing, and he never "shushed" her again. (*Id.* p. 59.) Hamilton also complains that Davidson suggested in February that she consult with an established and

respected SGM, Howard Highley, as a mentor. (*Id.* pp. 40, 41.) Hamilton was offended by this suggestion because she felt that Davidson could have suggested another female SGM, who she may have been more comfortable approaching. (#56 Ex. A, Hamilton pp. 40-41.) Hamilton admitted, however, that Davidson did not prevent her from consulting other SGMs, and that she did consult Highley *and* female SGMs and found their advice to be helpful. (*Id.* pp. 44-45.) She claims she also told Ruckrich about Davidson's recommendation, and Ruckrich told her that she could consult with whomever she liked. (*Id.* pp. 44-45.)

On February 5, 2004, Hamilton received written performance coaching. (#56 Ex. A, Hamilton Ex. 1.) The memorandum indicated that Hamilton:

- "has been deficient in the leadership skills necessary to run the complexity of our business at The Great Indoors."
- "has not communicated or followed through effectively to ensure that people are engaged in their respective businesses."
- "has not communicated effectively with her team."
- "needs to be engaged in the total operation of the store."
- "needs to utilize her peers as well as her Region Manager and other resources, i.e. Buyers for guidance."

(#56 Ex. A, Hamilton Ex. 1.) As a result of her performance deficiencies, Hamilton's probationary period was extended an additional 30 days, through March 9, 2004. (*Id.*) Hamilton, Davidson, and Ruckrich signed the corrective action plan. (*Id.*) Hamilton claims that the written performance coaching was invalid and evidenced discriminatory bias. (*Id.* pp. 46- 49.) Davidson, on the other hand, explained his decision to extend Hamilton's probationary period as follows:

> I thought Heidi could perform. And I thought Heidi's background and Heidi's dedication to the business and how we spoke when I made store visits, she had the capability. So I wanted to grant her the opportunity to succeed. So I gave her every opportunity at that point in time. And not just because 90 days was a rule. I wanted to go outside those confines and give her another 30-day period to see if she could perform.

(#56 Ex. C, Davidson p. 62.) Davidson stated that he based his performance evaluations on "in store observations. My speaking with people. Every opportunity I had to identify a positive in her ability to run a business, ... every opportunity I had to give her constructive feedback to improve her performance, I would have utilized." (#56 Ex. C, Davidson p. 64.)

In response to the memorandum, Hamilton claims that she consulted with Ruckrich, explained that she felt the coaching was invalid, and "expressed discomfort with Barry Davidson's management style." (#56 Ex. A, Hamilton pp. 53-54.) Hamilton stated that in February or March 2004, she:

> told [Ruckrich] I felt that the whole thing was based on the fact that when Barry had stated he didn't see her managing the store. I felt that he had been friendly with the previous manager, who was a male, and I felt that he was giving me the message he would only be comfortable if he saw another male managing the store. That was my opinion.

(*Id.* p. 64; *see also* pp. 34-37.) Hamilton claimed that Barry Davidson stated that he did not see her managing the store a number of times during her tenure at TGI. (*Id.* pp. 71-72.) Hamilton's only evidence of gender bias is her assertion that Davidson had a good relationship with the previous SGM of the Las Vegas store, Kevin Lemin. (*Id.*) Hamilton admitted, however, that Ruckrich responded appropriately to her complaint. (*Id.* pp. 39, 40.)

## III. Hamilton's Performance after Her Probationary Period.

### A. TGI Continues Working with Hamilton.

On April 8, 2004, Davidson created a Corrective Plan for Hamilton, designed to address a number of her performance issues. (#56 Ex. C, Davidson pp. 73-74; Davidson Ex. 3.) The plan listed a number of performance issues, including Hamilton's lack of "initiative," poor management style, failure to listen to her team and react as a problem solver, poor communication and performance management, and failure to "respond or hold [herself] accountable for open positions within the store," among other listed concerns. (*Id.* at p.73-74;

Davidson Ex. 3). Davidson remarked "Heidi's performance has not met the expectations of the business. Numerous conversations and store visits have not showed Heidi's commitment to drive this business." (#56 Ex. C, Davidson pp. 73-74.) The plan noted that continued issues would lead to further discipline, "up to and including termination." (*Id.*) Davidson and Hamilton signed the Plan on May 8, 2004. (*Id.*)

Hamilton claims that the plan was based on Davidson's "opinion" and "misinformation," and that Davidson sought input from the wrong people to evaluate her. (#56 Ex. A, Hamilton pp. 73-75.) Hamilton testified she thought the comments in the plan reflected bias, but she admitted "it's my opinion that *this is just based on his opinion of me personally*." (*Id.* p. 79; emphasis added.) She thought it would have been different if she were a male "just because of the high esteem that Barry held a lot of his male managers in – *which I'm not saying was not justified* they were doing a good job or good people or anything else – *but I don't think that this ever would have been delivered to anyone else other than me.*" (*Id.* p. 79; emphasis added). Hamilton told Ruckrich that she disagreed with the evaluative comments, that she thought they were "petty," and that Davidson had told her to sign the plan even if she disagreed with it. (#56 Ex. A, Hamilton p. 85.) At the same time, Hamilton admitted that she knew that Davidson thought highly of the performance of other female SGMs at TGI. (Hamilton p. 91; *see also* Declaration of Barry Davidson, ¶ 3 (explaining that he thought highly of other female SGMs.))

**B. Senior Management's Perception of Hamilton.**

Hamilton claims that in August 2004, after a store visit from Catherine David, TGI's highest ranking executive, Davidson told her to ignore David's suggestion concerning whether to display some of the bathroom accessories in the bedding department (Davidson did not want them displayed there). (#56 Ex. A, Hamilton p. 114.) Hamilton claims that Davidson's comment is evidence of gender discrimination because David was female. She alleges that she

told Ruckrich about Davidson's comment. (*Id*. at 115.) Hamilton also alleged that David thought well of her. (*Id.* p. 118.) David, however, opined that the senior leadership at TGI perceived Hamilton as "unprofessional," and that her style conflicted with management. (#56 Ex. E, C. David pp. 31-33.)

Hamilton claims that Buxton, Davidson's boss, made a store visit in September or October 2004, and said positive things about the store. (#56 Ex. A, Hamilton p. 116.) Hamilton told Ruckrich about Buxton's positive feedback. (*Id.* at 117.) She felt that Buxton's comments reflected that Davison's negative opinions of her must have been based on gender bias. (*Id*. at 117.) Buxton, however, stated that he had only a limited opportunity to observe Hamilton's performance, as that was Davidson's job. (#56 Ex. D, Buxton, pp. 33; 66-67.) Buxton opined that based on his observations, Hamilton was one of the worst store managers, and, at the annual SGM meetings, she appeared "silly" and "unprofessional." (*Id.* pp. 33, 39-40, 42.)

**C. TGI Continues Working with Hamilton in 2005.**

On January 5, 2005, Davidson created another corrective action plan for Hamilton. (Ex. 5.) The plan noted a number of performance deficiencies, including: failure in the replenishing process on the floor; no ownership in the process; untimely decisions of product write-offs (Davidson testified Hamilton had the worst write-off in the entire company for the year 2004); merchandising and visits continued to be inconsistent; and Heidi's failure to build a "cohesive team to insure one of high performance." (#56 Ex. E, Davidson pp. 70-72; Ex. 5.) Davidson claimed that Hamilton had a number of these issues in 2004 and also in 2005. (*Id.* at p. 72.) The plan notes that "during her tenure, Heidi has not consistently embraced the ability to mange her team to ensure that all standards and results are met." (#56 Ex. E, Ex. 5.) Hamilton acknowledged receipt and review of the plan. (*Id.*)

Also in January 2005, Hamilton felt slighted during the annual meeting of SGMs because Davidson did not push forward any of her ideas. (#56 Ex. A, Hamilton pp. 124, 126.) She also complained that Davidson did not praise her for a high customer service score, and that Davidson told her she should be more like Ken Wastradowski and Howard Highley, two other SGMs. (*Id.* pp. 124, 125-127.) Hamilton sees these actions as further evidence of gender discrimination. (*Id.*) At unspecified times, Hamilton claims that Davidson told her he would rate her 17th out of the 17 SGMs, and that she had the highest writeoffs in the company. (*Id.* pp. 213, 214.)

In early 2005, as part of the annual performance review process for 2004, Hamilton performed a self-assessment and Davidson completed his review based on his personal visits to the store. (#56 Ex. 30; *see also* #56 Ex. C, Davidson p. 73.) Davidson's review had not been formally presented to Hamilton before she quit. (#56 Ex. A, Hamilton p. 196.) The review shows that Hamilton earned the lowest evaluation for leadership abilities of any TGI SGM. The review summarized a number of performance concerns that were cited in previous corrective action plans, including:

- "Heidi has not managed to form a cohesive team effort to establish a smooth running store. She does not spend quality time on the selling floor ensuring standards are being followed. Minimal quality time is spent on back of the house issues, as documented on store visits."

- "Heidi has spent little time in the development of associates. She has not been a role model. Has shown inappropriate behavior during the past year, which has been detrimental in her role as SGM. Poor judgment calls on her part."

- "Heidi is currently on performance plan due to overall performance concerns. She has lacked leadership skills to ensure follow through of company direction."

(Ex. 30.) Davidson also testified that Heidi lacked "focus" and "ownership," and that the Las Vegas store suffered from management issues. (#56 Ex. C, Davison p. 72.)

Davidson used a "fact-based matrix" in determining how to review Heidi Hamilton's management numbers. Davidson cited a number of records, including a "price integrity audit" showing that Hamilton's store had the lowest scores in the nation:

> [W]e have a service that comes in and does a scan of our floors to make sure the signing and markdowns are taken appropriately. So under Nevada law – I believe even under the federal law – you have to be at 98%. 98 items out of 100 need to scan at the right price.
>
> It's the store's responsibility to ensure pricing and ticketing and signing are all correct so when a customer comes in and you're providing the utmost service to the customer on the price. ...
>
> Our audit score in Las Vegas was 89. This is not one audit. This is numerous average audits throughout the year. As I document here, it was the lowest score out of 17 stores.

(#56 Ex. C, Davidson pp. 89-91.) Hamilton's customer service survey score was good "but it wasn't as good as the year's previous [score]" (*Id.* at p. 92.) Based on these materials and his own assessment from his visit to Hamilton's store, Davidson gave Hamilton a leadership score of "2" which reflects "some expectations met." (*Id.* p. 92.) Davidson summarized the important leadership role of an SGM:

> The store general manager creates the culture of the store, including providing leadership and ownership. When leadership and ownership are not exhibited, exceptional customer service, revenue, and a good work environment for associates and a friendly and efficient store for customers impacts our business."

(*Id.* pp. 72-73.)

**D.  Hamilton's 2004 Bonus is Reduced as a Result of Her Performance Review Scores.**

As part of her compensation scheme, Hamilton received an incentive award in the form of a bonus if certain company-wide and store driven goals were met. (#56 Ex. G.) The amount of the incentive award was subject to a discretionary incentive reduction ("DIR") if the employee's

performance failed to meet certain qualitative minimums. Davidson and his direct supervisor Buxton chose to reduce Hamilton's 2004 incentive by 25%, based on Hamilton receiving a score of "2" on leadership principles. (#56 Ex. C, Davidson pp. 99-100.) Hamilton was aware of the reasons for the reduction in her bonus amount. (#56 Ex. A, Hamilton p. 199.) The DIR reduction reduced her bonus a total of $8,420 (from $33,680, to $25,260). There is no evidence that any other SGM, male or female, received marks that warranted a DIR reduction. (#55 Davidson Dec. ¶ 4.)

**IV. <u>February 28, 2005: Hamilton Quits, and TGI Offers Her a Severance Package .</u>**

In February 2005, Hamilton alleges that she "called David Ruckrich and said, you know, Barry was in and told me 'why don't I just pay you to find another job.' And I said, you know what, I have decided that no matter what the results are of the store, no matter what I do, that nothing is going to change his opinion in the way he treats me. And I have come to the point that I am willing to take him up on his offer." (#56 Ex. A, Hamilton p. 97.) Ruckrich reacted with shock, and he said he would call her back. He later advised her that "he had spoken to Barry and Barry had said that." (*Id.* p. 97.) When Ruckrich called her back, she said "I want to find out for me, you know, what exactly the offer is that he's going to pay me to find another job." (*Id.* p. 100.)

In response to her request for a severance package, TGI offered her one month's severance pay because she was voluntarily quitting and because she had a short length of service with the company. (#56 Ex. F, Ruckrich pp. 45-46; 94-96; Ex. A, Hamilton Ex. 13; Ex. C, Davidson p. 46.) No other SGM under Barry Davidson that quit received a severance offer. (#55 Davidson Dec. ¶ 5.) Hamilton rejected the offer. (#56 Ex. A, Hamilton p. 111.) Buxton, the manager of HR, and Davidson accepted Hamilton's resignation and terminated her employment. (#56 Ex. D, Buxton p. 37.) Subsequently, Hamilton claims that she informed TGI she would

return to work though her attorney, but that TGI had already replaced her with another SGM. (#56 Ex. A, Hamilton pp. 136-137; 204.)

**V. <u>TGI Continues Hamilton's Health Coverage after Her Employment.</u>**

After her termination, Hamilton claims she never received COBRA notification. Hewitt & Associates administered the TGI health benefits. (#56 Ex. G, Defendant's Answers to Plaintiff's First Set of Interrogatories, Nos. 6 & 7.) HR manager Loraine Mutsch contacted the Sears Associate Service Center ("ASC") to inform them of Hamilton's termination. (*Id.*) Under normal procedures, ASC would then contact Hewitt & Associates who would provide COBRA notification to the terminated employees. (*Id.*) Here, due to a computer error, the information that Hamilton was terminated did not reach Hewitt & Associates until March 2006. (#56 Ex. H, Defendant's Responses to Plaintiff's First Request for Admissions, Nos. 1, 2, 3.) As a result, TGI provided Hamilton with full health coverage through March 31, 2006, more than a year after she was terminated. (*Id.*) She was not required to pay COBRA premium costs for any of that coverage period. (#56 Ex. A, Hamilton pp. 147-148, 154.) On March 13, 2006, TGI provided Hamilton with COBRA notice, and Hamilton subsequently utilized TGI's health plan through September 30, 2006. (Ex. 48; Hamilton pp. 155; 221.)

**VI. <u>Summary Judgment Standard of Review</u>**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). As summary

judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the party opposing the motion may not rest on the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the nonmoving party bears the burden of a claim or defense at trial, the moving party can meet its initial burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. Conversely, when the moving party bears the burden of proof at trial, then it must establish each element of its case at summary judgment.

## VII. Analysis

### A. Gender discrimination based on disparate treatment.

To prove a *prima facie* case of gender discrimination based on disparate treatment, Hamilton must show that: (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with similar qualifications were treated more favorable. *Bergene v. Salt River Project Agric. Improvement and Power Dist.,* 272 F.3d 1136, 1140 (9th Cir. 2001). If Hamilton can prove the *prima facie* case, the employer must then show that the action was taken for a legitimate, non discriminatory reason. *Id.* Hamilton must then demonstrate that the offered reason is a pretext for unlawful discrimination. *Id.*

Hamilton cannot show that she was meeting her employer's legitimate expectations. *See Richmond v. Univ. of Minnesota,* 595, 598 (8th Cir. 1992) (*prima facie* case failed because poor performance record showed that plaintiff was not qualified for her job). The record is replete with documentation of Hamilton's poor performance: her extended probationary period, the corrective plans, the low accuracy of her pricing audit, her reduced bonus, and the impression among TGI senior management that Hamilton was unprofessional and not performing to expectations. *See* #56  Ex. A, Hamilton Ex. 1; #56  Ex. C, Davidson pp. 89-91; #56  Ex. D, Buxton, pp. 33, 39-40, 42. The evidence shows that according to several sources Hamilton was not meeting her employer's legitimate expectations.

Moreover, Hamilton cannot show that other similarly situated male employees received more favorable treatment. To do so, Hamilton must show that she was similarly situated in all material respects to the other employees. *Morgan v. Selig,* 447 F.3d 748, 755 (9th Cir. 2002). In regard to her bonus reduction, Hamilton was the only SGM to receive a score of 2 on her performance review, which qualified her for a bonus reduction under TGI policy. Under *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641-42 (9thCir. 2003), employees are similarly situated when they have similar jobs and display similar conduct. Hamilton has introduced no evidence of a male SGM who was in a similar position or performance level, yet received no bonus reduction. Her failure to do so prevents her from establishing a *prima facie* case of disparate treatment. *Morgan v. Selig,* 447 F.3d at 755.

Even if Hamilton could establish a *prima facie* case, TGI had legitimate business reasons for the reduction in bonus and the one month severance offer - the score of 2 on the performance review and the fact that Hamilton voluntarily resigned after only one year with the company. *See* #56  Ex. C, Davidson p. 92; #56  Ex. A, Hamilton pp. 97-100. To establish pretext, Hamilton must provide specific or substantial evidence of pretext or discrimination; plaintiff's opinions

and beliefs alone are insufficient evidence of pretext. *Keyser v. Sacremento City Unified Sch. Dist.,* 265 F.3d 741, 753 n.5 (9th Cir. 2001). Hamilton has not met this burden.

Furthermore, an employer is entitled to set "whatever reasonable standards it wishes and to require its employees to meet those standards." *Manniko c. Harrah's Reno, inc.,* 630 F. Supp. 191, 198 (D. Nev. 1986). An inability to get along with co-workers and supervisors is a valid reason for discharge. *Id.* Plaintiff cites to numbers indicating that the store's overall performance was acceptable. But Hamilton's performance is subject to TGI's legitimate standards and expectations, and the undisputed facts show that she was not meeting the benchmarks set by her supervisors. Hamilton has shown no evidence that she was performing up to TGI's standard for SGM's.

For these reasons the Court grants summary judgment to Defendant on Hamilton's claim of gender discrimination based on disparate treatment. Hamilton cannot show that she was performing up to her employer's legitimate expectations, or that similarly situated employees were treated better. Hamilton has failed to introduce any evidence other than her opinion that she was meeting with her employer's expectations, and has introduced no evidence of better treatment for similarly situate co-workers.

**B. Hostile work environment based on gender.**

Hamilton's Response does not respond specifically to Defendant's argument that summary judgment should be granted on her claim of hostile work environment based on gender, and her Response contains no argument that she experienced harassment on the job. (#60.)

To establish a *prima facie* claim of hostile work environment Hamilton must show that (1) she was in a protected group; (2) that she was subjected to unwelcome harassment; (3) based on sex; (4) that affected a term, condition, or privilege of employment; and (5) that TGI failed to take prompt and effective remedial action in response to her complaints. *Brooks v. City of San*

*Mateo,* 229 F.3d 917 (9th Cir. 2000).  Hamilton fails to meet the second and third elements of the test.

Hamilton has introduced no evidence of gender based harassment.  In *Bradshaw v. Golden Rd. Motor Inn,* 885 F. Supp 1370 (D. Nev. 1995), a female blackjack dealer brought claims of a hostile work environment based on sex.  The plaintiff in that case offered conclusory statements and self serving allegations, without supporting details.  *Id.* at 1379.  The court held that personal animosity was not the equivalent of sex discrimination, and is not proscribed by law.  *Id.* at 1380.

In this case Davison's comments are not motivated by gender.  Hamilton's own statements reflect that the statements were not gender based, but were personal to her.  Her statements such as, "his opinion of me personally," and "I don't think this would have been delivered to anyone else other than me," indicate that the conflict was personal - not gender based.  #56  Ex. A, Hamilton p. 79.)  Even taken together, the comments do not indicate that a hostile environment existed.  A supervisor's job is to make evaluative comments, such as those made by Davidson.

Summary judgment is granted on Defendant's behalf on Hamilton's hostile work environment claim because she cannot establish a *prima facie* case.  Specifically, there is no evidence that she was subject to gender based harassment that would have created a hostile work environment.

**C.     Retaliation claim.**

As an initial matter, Hamilton has not exhausted her administrative remedies on this claim.  *See Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1107 (9th Cir. 1991) (to bring an action for retaliation, a plaintiff must first exhaust administrative remedies).  Hamilton's

retaliation claim was not investigated by the NERC or EEOC and may be dismissed as a matter of law. *Id.*

To establish a *prima facie* retaliation claim Hamilton must establish (1) that she engaged in protected activity, (2) an adverse employment action was thereafter taken against her, and (3) a causal link exists between the two events. *Steiner v. Showboat,* 25 F,3d 1459, 1464 (9th Cir. 1998). Here, the protected activity is Hamilton's complaint regarding Davidson's behavior. Hamilton may only assert retaliation for her bonus reduction and her one month severance package. The decision to reduce Hamilton's bonus was made by Buxton and Davidson, both of whom had no knowledge of the complaints made against Davidson when they made the decision. The offer of a one month severance package to Hamilton was made by the legal department and human resources, no evidence that the severance package was impacted by her complaints against Davison.

Summary judgment is granted for Defendant on the retaliation claim. Hamilton failed to exhaust her administrative remedy by filing a complaint with the EEOC or NERC and she cannot show a causal link between her complaint regarding Davidson and any adverse employment action.

**D. COBRA notification and Plaintiff's Cross Motion for Summary Judgment (#57).**

Hamilton seeks damages and fines for TGI's failure to notify her of her COBRA rights. Defendant admits that they failed to notify Hamilton when she resigned from TGI. Defendant mistakenly continued to pay Hamilton's insurance for a year, finally providing her with a notification of her COBRA rights in mid-March 2006, and terminating the coverage at the end of that month.

Under 29 U.S.C. § 1132(c)(1)(A), an ERISA plan administrator may in the court's discretion be liable for up to $100 per day from the date of the failure to notify a beneficiary.

Courts have declined to award statutory damages when the failure to notify did not reflect an intentional disregard of COBRA's requirements or bad faith. *See Starr v. Metro Systems,* 461 F.3d 1036, 1039 (8th Cir. 2006) (declining to impose a penalty when the administrator's record keeping system failed). The Court should also consider whether Plaintiff was harmed by the delay in notice. *Id.*

Here, Hamilton continued to receive health benefits at TGI's expense for a year after she had resigned. Plaintiff obtained prescription drugs under the TGI insurance after her resignation. But Hamilton claims that she was unaware that her coverage had been cancelled and that she would have sought counseling under the TGI coverage if it had been available to her. Hamilton did obtain medical coverage though her fiancee, but that coverage was only valid in California. In addition to statutory damages, Plaintiff seeks fees and costs associated with her COBRA claim.

The Court grants summary judgment in favor of Hamilton, but denies fees and costs. The statutory $100 a day is too severe because TGI's mistake was inadvertent. Damages may be awarded to the extent that Hamilton can show that she was forced to pay additional taxes or out of pocket costs which would have been covered under her TGI insurance - if those costs are in excess of the prescription drug benefit actually provided by TGI and/or presently unreimbursable. There has been no such showing.

**VIII. <u>Conclusion</u>**

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (#54) is *granted in part* with respect to the claims for gender discrimination, hostile work environment, and retaliation. Defendant's Motion is *denied in part* with respect to Plaintiff's claim of COBRA notification failure.

IT IS FURTHER ORDERED that Plaintiff's Cross Motion for Partial Summary Judgment (#57) may be *granted,* but Plaintiff is not awarded fees or costs, nor will the Defendant be assessed the $100 per day statutory penalty. Rather, damages may be awarded to the extent that Plaintiff incurred any additional costs in excess of the prescription drug benefit provided by TGI or other medical expense covered by TGI's insurance coverage which is not presently reimbursable for the year following her resignation. Plaintiff shall have 20 days to supplement her pleadings to allege such damages with response to follow. Judgement will be entered accordingly.

DATED: February 20, 2008

ROBERT C. JONES
UNITED STATES DISTRICT COURT JUDGE

(mr)